UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

---

DEBORAH TURNER, TRACIE STEMPIEN,
HELEN MILLER, and TIMOTHY MEDLEY,

                                 Plaintiffs               File No. _____

vs.                                        Hon. _____

RICK SNYDER, in his official capacity as       Magistrate _____
Governor of the State of Michigan,
MAURA CORRIGAN, in her official
capacity as Director of the Department of
Human Services,
STEVEN HILFINGER, in his official
capacity as Director of the Department of
Licensing and Regulatory Affairs,
MIKE ZIMMER, in his official capacity as
Executive Director of the Michigan
Administrative Hearing System,

                            Defendants.

---

## COMPLAINT

---

The plaintiffs—Deborah Turner, Tracie Stempien, Helen Miller, and Timothy Medley—make this Complaint against these defendant Michigan state officials: Governor Rick Snyder; Director Maura Corrigan of the Department of Human Services; Director Steven Hilfinger of the Department of Licensing and Regulatory Affairs; and Executive Director Mike Zimmer of the Michigan Administrative Hearing System.  The plaintiffs are suing for an order to remove them from the Central Registry of Child Abuse and Neglect, a declaratory judgment that the Michigan Central Registry laws are unconstitutional, as written and applied, and an injunction against enforcing those laws.

**Introduction**
**(No Answer Required for this Section)**

This is a lawsuit to end the Michigan Central Registry of Child Abuse and Neglect in its present form because it is an unconstitutional and unfair "black-list" comprised of people accused by a government investigator of harming a child. The Michigan child abuse registry is a government list that is easy to get on, but hard to get off.  It injures constitutionally protected interests of property and family.  A registry listing amounts to a "life sentence" of being labeled a child abuser that adversely impacts employment and education, charity and child-rearing. Those damages flow from registry information not being confidential. It is shared by the state with child-related employers and organizations and used for background checks by public and private employers and other organizations, even if there is no child connection to the work.

The listing procedure is subjective, one-sided, and automated. At the end of a CPS investigation, the investigator becomes the judge and pronounces the accused to be guilty and unsafe to be around children (called a "substantiation").  The CPS worker then clicks a computer key to put an individual on the Central Registry--for life--with no neutral prior hearing to determine if the investigator's accusation is true.

Although Michigan law provides a removal procedure (called "expungment") after the listing is made, in practice it is not an adequate post-deprivation due process remedy.  It is slow and unfair and cannot be directly accessed by the accused.  The only quick way to get off the registry is to die.

All the plaintiffs have sustained the constitutionally recognized injuries inherent in the Michigan Central Registry laws and process— the stigma of an unjust accusation of child abuse or neglect, loss of employment and income, inability to associate with other children, or

limitations on raising their own children. None of them have been found by a court to have

harmed any child.  None of them got adequate written notice of the charges against them.  None

of them were given a hearing before or after the listing to contest the accusations.  But they are

all on the registry for life and suffering financially, or in their family life, for it.

## FACTUAL ALLEGATIONS

### Jurisdiction and Venue

1.      The court has federal question jurisdiction of this civil rights case challenging the

constitutionality of state laws and practices, and for declaratory and injunctive relief, under 42

U.S.C. 1983 and 28 U.S.C. 2201.

2.      The transactions or events occurred in the State of Michigan in the county of

Jackson in the Eastern District of  Michigan and in the counties of Ingham, Calhoun, and

Montcalm in the Western District of Michigan.

3.      Plaintiffs TURNER and MEDLEY reside in the county of Jackson in the Eastern

District of Michigan and the events in this complaint occurred there.  Plaintiff STEMPIEN

resides in Kent County, and the events in this complaint occurred in Montcalm County, which

are both in the Western District of Michigan.  Plaintiff MILLER resides in Calhoun County in

the Western District of Michigan where the events in this complaint occurred.

4.      The official defendants, SNYDER, CORRIGAN, HILFINGER, and ZIMMER

reside in their place of business in Ingham County in the Western District of Michigan.

5.      Venue is in the Western District of Michigan under 28 U.S.C. 1391 (b).

**Parties: Defendants**

6.      RICK SNYDER is the Governor of the State of Michigan. He is sued in his official capacity.  Pursuant to Article V, Section 1 of the Constitution of Michigan of 1963, the executive power is vested in the Governor.  Pursuant to Article V, Section 8 of the Constitution of Michigan of 1963, the Governor is responsible for ensuring that all executive departments and agencies, including DHS and LARA, and to faithfully execute and comply with applicable federal and state law.

7.      MAURA CORRIGAN is the Director of the Department of Human Services ("DHS"), acting as the agency's executive director and responsible to the Governor. She is sued in her official capacity. Director Corrigan is responsible for administering all DHS child welfare programs, including Children's Protective Services ("CPS").  Part of her duties is to maintain the Central Registry of Child Abuse and Neglect, as required by the Child Protection Law, MCL 722.627 (1).

8.      STEVEN HILFINGER is the Director of the Department of Licensing and Regulatory Affairs ("LARA"), acting as the agency's executive director and responsible to the Governor. He is being sued in his official capacity. The Michigan Administrative Hearing System is located in LARA.  Pursuant to Executive Reorganization Order No. 2011-4,  MCL 445.2030, the budgeting, procurement, and related management functions of the Michigan Administrative Hearing System shall be performed under the direction and supervision of the Director of the Department of Licensing and Regulatory Affairs.

9.      MIKE ZIMMER is the Executive Director of the Michigan Administrative Hearing System ("MAHS") and is responsible to the Governor. He is being sued in his official

capacity.  MAHS was created by Executive Reorganization Order No. 2011-4, MCL 445.2030,

to replace the predecessor hearing office, State Office of Administrative Hearings ("SOAHR").

MAHS is an independent and autonomous agency within the Department of Licensing and

Regulatory Affairs ("LARA"). Administrative law judges in MAHS— as did the ALJ's in

SOAHR before it— conduct the administrative hearings for individuals seeking expungement

from the Central Registry, also known as registry appeals.  By state law MAHS is independent

of the Director of LARA when exercising its responsibility to conduct administrative hearings.

### Parties: Plaintiffs

10.    The plaintiffs share these facts in common:

(a)    They were listed on the Central Registry in 2010 or 2011 by a
county Children's Protective Services investigator because
the investigator decided they mistreated a child;

(b)    They were put on the registry for alleged child neglect;

(c)    There is no court or administrative finding or judgment that any
plaintiff committed child abuse or child neglect;

(d)    Prior to being listed on the registry, the State of Michigan did not provide
the plaintiff a hearing on the validity of the child neglect accusation;

(e)    If a plaintiff got written notice of the listing the notice did not provide
any details on the alleged offense.  The standard notice letter
they received only provided conclusory labels of the offense,
such as "failure to protect" or "physical neglect" or "threatened harm";

(f)    After being listed on the registry, they were not provided
lawful, prompt, or fair procedures to get removed from the registry;

(k)    They have suffered a stigma from being labeled by the state as a "child
abuser" and put on a government list of other child abusers;

(l)    In addition to the damage to their reputation, being on the registry has
caused them a financial loss related to employment or a restriction on their
freedom to raise their children, associate with family, or chose a vocation.

**Plaintiff: Deborah Turner**

11.     Plaintiff DEBORAH TURNER is a wife, mother, and grandmother. Her prior employment was as a secretary with the F.B.I. in Detroit and Headstart (Community Action Agency) in Jackson, Michigan.

12.     In 2012 she was fired from her Headstart job because she was listed on the Central Registry in 2010 by Jackson County CPS for agreeing with her husband to return their adopted daughter to DHS. They did this to protect the family from this violent and emotionally disturbed teenager and to get her the mental health care that they could not afford, but that the state refused to provide. The girl's outpatient psychiatrist had recommended long-term hospitalization and believed that a child with her diagnosis and behavior should be living in a group setting and not in a family-like setting.

13.     When they had adopted the girl at the age of five, the Turner's had a contract with the state ("adoption medical subsidy") that required the state child welfare agency (then the Family Independence Agency) to pay for mental health care for the girl, who had already been diagnosed with a serious mental illness. The Turner's had problems getting DHS to honor that contract through the years, especially for hospitalization.  After the plaintiff and her husband turned the child over to the state when she was age 15 in 2010, she became a court ward,  and DHS has provided her two years of residential mental health treatment.

14.     On July 19, 2010, two Jackson County DHS employees listed plaintiff DEBORAH TURNER on the Central Registry. These were the CPS investigator, Angela Jackson, and her CPS supervisor, Jaclyn Caroffino. The written registry notice sent to the plaintiff said the listing was for "physical neglect" with no further details.

15.     Angela Jackson created two different risk assessment scores for the plaintiff in a six week period.  On June 16, 2010, she scored her as moderate risk, which would not qualify her for listing on the registry. On July 23, 2010, Jackson scored her as a high risk by using the discretionary override option on the risk assessment form.  With this override, Jackson elevated the plaintiff's risk score to a higher category that requires a registry listing.

16.     CPS filed a petition in the Jackson County 4th Family Court against plaintiff Turner and her husband accusing them of child neglect of their adopted daughter and requesting the removal of their daughter.  The petition was signed by Angela Jackson, the CPS investigator, and Nikki Kegerreis, a manager in the Jackson DHS office.

17.     In the child protection court case the plaintiff was not found by a judge or a jury to have committed child abuse or child neglect.  In child welfare law, this means she was not a "respondent" and was not "adjudicated" for committing an offense against a child as defined by the Juvenile Code of the State of Michigan.

18.     On August 17, 2010, the plaintiff made a written request to be expunged from the registry to Jackson County DHS.  On August 31, 2010, Nikki Kegerreis denied the request in writing.  The denial included a form to obtain an administrative appeal with instructions to send the request to the supervisor who signed the registry notice letter.

19.     On September 1, 2010, the plaintiff and her husband released their parental rights to the adopted daughter under the Adoption Code in Jackson County family court. The judge accepted the releases with a finding that this was in the best interest of the child.

20.     On December 7, 2010, the plaintiff's attorney mailed a request for administrative hearing to Jackson County DHS addressed to Jacklyn Caroffino.   In the request she asked for

"an expedited hearing because she could lose her job with Head Start is she is not expunged from the registry by February 1, 2010 [*sic*: 2011]".

21.     The plaintiff has not been able to get an administrative hearing to expunge her registry listing because Jackson County DHS did not send the appeal papers to the hearing office. On February 9, 2012, the plaintiff found out that the appeal paperwork had not been sent to MAHS—14 months after it was filed in the county office.

22.     On February 29, 2012, the plaintiff was terminated from her secretarial job of 17 years at Headstart because she was on the registry.  Her employer could have lost its license from the state and federal governments if it did not fire her.

23.     The plaintiff is getting unemployment benefits from the State of Michigan. She cannot afford to hire an attorney to get an expungment from the registry.

**Plaintiff:  Tracie Stempien**

24.     Plaintiff TRACIE STEMPIEN is a wife,  mother, and grandmother. At the time of these events she had two sons ages 14 and 16. She has had unemployment problems during the recession.  Because she was listed on the Central Registry she lost an opportunity for a government subsidized job training program for a medical occupation.  Now she is under-employed in a part-time clerical job. Due to the registry listing she cannot fully participate in her minor son's life because she cannot pass a background check to volunteer at his school or his activities. The listing has also affected her ability to associate within another minor relative.

25.     On July 8, 2010, the plaintiff's 15 year old son falsely accused his father of punching him in the face.  This led to the police and CPS taking both boys from the home at the

request of the father and a CPS petition being filed in Montcalm County family court against both parents.

26.    A few days later at a DHS meeting the teenager admitted he had lied to the police and that he had bitten his lip to create an injury.  His recantation was known to all participants in the court case, including the CPS investigator Denise Potter and her supervisor, Susan Greenfelder.

27.    On December 14, 2010, the family court closed the child protection case.

28.    The plaintiff got no registry notice while a child protection case was pending in Montcalm County family court from July to December 2010, although she and her attorney demanded a timely registry notice. During and after the case closed the plaintiff got conflicting information from DHS employees about her registry status. She received different written responses when she filed a clearance request form with Montcalm County DHS. In January 2011 she got a letter stating she was not on the registry. In March 2011 she got a written notice that she was on the registry.

29.    On information and belief, the plaintiff was listed on the Central Registry in March 2011 because in July 2010 her husband told the police to take the two children from the home after the older boy falsely accused his father of physical abuse.  She does not know for sure why she is listed on the registry because the written notice description of the offense consisted of two words—physical neglect—and Montcalm County DHS failed to provide the full CPS file to the plaintiff, despite several oral and written discover requests by the plaintiff from August 2010 through April 2011.

30.     In January 2010 the plaintiff was laid off her job when the company she worked for closed.  In 2011 Michigan Works, the state employment assistance program, offered to pay $10,000 for the plaintiff to get training for a career change to become a certified nurse aide (CNA).  The job training grant was a short-term opportunity provided by the Obama administration's "No Worker Left Behind" program.

31.     Walker Medical, the training provider, requires a registry clearance for applicants for the CNA program and a registry clearance would be needed for most employers who hire a CNA. So in January 2011 the plaintiff made further inquires of Montcalm DHS on her registry status.

32.     On January 18, 2011, Montcalm County DHS sent the plaintiff and her husband a written registry clearance for both of them. The notice for the plaintiff stated:  "There is no record of Tracie Stempien as being identified as a perpetrator of child abuse and/or neglect on the Child Abuse/Neglect Registry system as of the date of the inquiry."  The notice was signed by Susan Greenfelder, the supervisor for the CPS investigator, Denise Potter.

33.     Having received the necessary registry clearance, the plaintiff got on the schedule to start the training program on March 7, 2011.  She was not able to complete the program because, unknown to her, Montcalm County DHS had put her on the registry two weeks before the start of the program.

34.     In February 2011 Denise Potter completed the administrative tasks on the DHS computer to close the CPS case that she had opened on the plaintiff's family in July 2010.  On information and belief, something in this case closing process caused the computer to list the

plaintiff and her husband on the registry and to generate a registry notice letter for Potter and her supervisor to sign.

35.     On February 23, 2011, Denise Potter and Susan Greenfelder listed the plaintiff on the Central Registry, but did not notify her about the listing for three weeks.  The listing was for "physical neglect" with no other details on the offense. The two women signed the written registry notice to the plaintiff on March 14, 2011, the same date the plaintiff spoke to Denise Potter on the phone and found out from Potter that she was listed on the registry. Potter told the plaintiff that she should have no problem getting removed from the registry because Potter had noted in her CPS report that the plaintiff did not want the police to take her children. The plaintiff received the written registry notice that Potter mailed it to her on March 15, 2011.

36.     On April 18, 2011, plaintiff sent letters to Susan Greenfelder asking for her CPS file and requesting expungment from the registry by the county office.  She has gotten no written response to the letters.  In a follow-up phone call from the plaintiff about a month later Greenfelder told the plaintiff  "because your due process rights were violated it's working in your favor".

37.     Without the written decision denying expungment from the county office, the plaintiff  cannot file a registry appeal of that decision. Without having the CPS file, especially the investigation report and the risk assessment, the plaintiff does not know the accusations, supporting and contradicting evidence, and her risk assessment score.  As a result of these notice and discovery violations, she cannot file, prepare, or litigate an administrative appeal of the registry listing to get expunged and she cannot exercise another statutory right to correct the CPS record.

38.     The plaintiff believes it is important for a parent to participate in her one minor son's education and other activities.  Because of the registry listing, she cannot parent her child the way she believes is best because she cannot pass backgrounds checks required by most schools and child activities. A former brother-in-law will not let her see his child. The opportunity for government funding of training for a medical career for her is gone.  She is making less money at her current part-time job than she would have made at as a CNA or other health care jobs that require a registry clearance. She cannot afford to hire an attorney to get her an expungment.

### Plaintiff:  Helen Miller

39.     Plaintiff HELEN MILLER is a wife, mother, and grandmother, and was one of the most respected foster parents in Calhoun County until she got put on the registry.  She and her husband provided foster care at their home in Battle Creek for about a hundred Michigan children in their 25 years of work for Michigan children and the Department of Human Services.  They adopted eleven of these children.  Until August 2011 the plaintiff's record with DHS was an "extraordinary" record of safely caring for children, according to the county Foster Care Review Board, with no CPS reports and minimal licensing reports.

40.     The only substantiated CPS report about the plaintiff was in July 2011 when an incident at her daughter's house provoked a CPS investigator to put the plaintiff and her husband on the Central Registry and to remove their foster children.  Because she is on the registry, the plaintiff will probably lose her foster care license.  The registry listing interferes with her ability to find work to replace the child care payments from the state because she cannot pass a background check.

41.     Unlike the other three plaintiffs, plaintiff Miller was not investigated by her county DHS office and the validity of her registry listing was not reviewed by her county office. Because the allegations involved foster children, the CPS investigation and registry decisions were made by a state-wide unit called MIC—Maltreatment in Care—that is in the DHS Field Operations section in the central office. The CPS-MIC investigator was Michael Pascarella. His investigation led to his supervisors listing her on the registry and sustaining the listing after the plaintiff requested expunction.

42.     In July 2011 the plaintiff had five foster children and her two adopted teenagers living with her. Her adult daughter, Shaneekia Miller, did not live with the plaintiff, but some of the plaintiff's foster children visited there.  Unknown to the plaintiff, the daughter was allowing her felon ex-husband, who had a drug conviction, to stay at her home on occasion.

43     On July 27, 2011, the plaintiff sent the two youngest foster children to Shaneekia's house for an overnight visit.  The next morning, while the foster children were still there,  a drug raid occurred that found drugs hidden in the house by Shaneekia's ex-husband. The police made a CPS report because the foster children were at the scene; CPS instructed the police to return them to the plaintiff.  Shaneekia Miller's children were removed.

44.     On August 5, 2011, based on an investigation by Michael Pascarella, DHS removed all the plaintiff's foster children, including the three who were not at the drug raid. The DHS reason for the placement change was an opinion that the plaintiff posed "a substantial risk of harm to the child's emotional well-being". On information and belief, that conclusion was based on Pascarella's opinion that the plaintiff knowingly exposed the children to a drug raid and knew that the ex-husband was living in her daughter's home.

45.     On August 15, 2011, the Foster Care Review Board of Calhoun County

recommended all the foster children be returned to the Miller's. (The Foster Care Review Board

program is part of the Supreme Court Administrative Office and is tasked with reviewing

placement changes of foster children. It is comprised of appointed citizens.)  The Board's report

contained this statement about Michael Pascarella's stated threat at the FCRB hearing to list the

Miller's on the Central Registry:

> The board has great difficulty in understanding how a self-admitted, one-time
> error in judgment by Mrs. Miller is deserving of a "life sentence" on Michigan's
> Child Abuse and Neglect Central Registry. The rigidity of a policy that is so
> unforgiving of human error and which results in the trauma of an unnecessary
> placement disruption and loss of a safe and nurturing [*sic*] to the children it is
> designed to protect should raise significant concern to both policy makers and
> those required to carry out that policy.

46.     On  August 25, 2011, the plaintiff was listed on the registry for "improper

supervision" and "threatened harm".  On information belief, this was based on a substantiation

of child neglect made by the CPS-MIC  investigator Michael Pascarella and supported by his

supervisors in Field Operations—the woman who signed the expungment denial notice; the

manager of the office Mary Lou Mahoney; and Dawn Ritter, a supervisor in central office

Children's Protective Services.  Dawn Ritter signed the registry notice to the plaintiff.

47.     Pascarella, Mary Lou Mahoney, Dawn Ritter, and the unknown woman

who signed the expungment denial, have a mistaken understanding of the registry law.

They believe that foster parents could be placed on the registry with less evidence than

unlicensed persons because there was a "higher standard" and "zero tolerance" policy for

them, although no such standard or policy exists in the Child Protection Law. On August

12, 2011, a DHS representative told the Foster Care Review Board that the plaintiff would not be listed in the registry if she was a biological parent.

48.     On August 29, 2011,  after an evidentiary hearing the Calhoun County family court authorized the return of the two foster children, who were present for the drug raid at the daughter's home,  to the plaintiff's home because the DHS did not meet its burden of proof of harm or future risk. In the end the plaintiff had three of the five foster children returned and living with her; the other two did not return by choice or decision of a legal custodian.

49.     In August 2011 in a separate hearing Shaneekia Miller regained custody of her children.  On November 9, 2011, the Calhoun County family court dismissed the case against Shaneekia with prejudice and without a trial.  The court determined there was no claim of child neglect pled against the mother because a child's presence at a drug raid is not *per se* child neglect according to the Michigan Supreme Court.

50.     After the foster children were removed, there were administrative and court hearings related to the plaintiff's fitness and safe home. All the decision-makers decided in favor of the plaintiff by clearing her of any child neglect related to the drug raid in her daughter's home. These decisions were made by a circuit court judge, two referees, the Foster Care Review Board, and the Superintendent of the Michigan Children's Institute.

51.     The plaintiff hired an attorney to get her expunged from the registry.  The plaintiff and her attorney have made requests for expungment to Calhoun County DHS; CPS-MIC unit; Mary Lou Mahoney, the manager of Field Operations that includes CPS-MIC; Dawn Ritter at CPS central office; and to one of the defendants, GOVERNOR RICK SNYDER.  The requests have been denied. The request to the CPS-MIC unit was denied in writing on March 20, 2012,

from Field Operations signed by a person with an illegible signature. Defendant RICK

SNYDER denied the May 3, 2012, request for expunction on May 29, 2012, through a letter

from Steve Yager, the Deputy Director of Children's Services Administration in the Department

of Human Services.

52. The plaintiff filed a request for administrative hearing that was processed and

sent to MAHS. The registry appeal is scheduled for November 8, 2012, before an administrative

law judge.

53. Despite the registry listing, the Calhoun County judiciary has entrusted children

to the plaintiff, but DHS will not place any more foster children with her. In December 2011

Referee Tina Yost placed a teenage foster child in the home. In May 2012 Referee Norm Fryer

recommended, and a circuit court judge ordered, that the plaintiff get a juvenile guardianship of

her grandson---one of the two children present at the drug raid in her daughter's home. But the

plaintiff's registry listing is barring the financial subsidy for this guardianship

54. The plaintiff's foster care license, her desire to continue to foster children, her

reputation, and her livelihood have been impaired by the Central Registry listing. DHS has filed

a licensing revocation case against her because she is on the registry; a registry listing precludes

obtaining and keeping a foster care license. Michigan provides a due process hearing prior to

revoking a foster care license—but not for the registry listing that requires revocation.

### Plaintiff: Timothy Medley

55. Plaintiff TIMOTHY MEDLEY is a husband, father, and step-father raising his

step-children with his second wife. He is a business owner, homeowner, and a law abiding

citizen now after being rehabilitated in prison. He has a criminal record, but no criminal or civil

court record of hurting children.   He had not lived with his children in four years when  Jackson County CPS put him in the Central Registry—after he won an appeal against the agency to restore his parental rights. He is now in a reunification process in Jackson County family court that could end with him regaining custody of his children.  The registry listing interferes with his family life and parenting of his children because it limits his involvement in their schooling and other child activities.

56.     The plaintiff's two school-aged children have been temporary court wards and foster children since a removal from their mother in March 2008 while the plaintiff was in prison. This was the second removal of the children in two years in a child neglect case against the mother dating back to 2001.

57.      The plaintiff was never adjudicated as an unfit parent in a temporary custody petition in that case.  The only court finding of unfitness against the plaintiff was in a permanent custody case that he got reversed on appeal.

58.     In August 2009 the Jackson County family court terminated the parental rights of the plaintiff and the children's mother.  On July 1, 2010, the Michigan Court of Appeals reversed the order terminating the plaintiff's parental rights and remanded it to the trial court.

59.     After the remand Jackson County DHS decided to open a CPS investigation on the plaintiff in order to get information about current unfitness to keep him from getting his children. Based on information and belief, Jackson County DHS made a false claim that someone outside the agency made a CPS report  against the plaintiff on July 7, 2010.  Based on information and belief, the CPS investigation did not uncover any current parenting problems or unfitness of the plaintiff.

60.     On July 27, 2010, Gulamali filed a petition against the plaintiff in Jackson County family court to stop or delay the plaintiff from getting his children. The petition was never litigated because DHS voluntarily dismissed it in October 2010 after the defendant lost his motion for an immediate return of the children.

61.     On August 1, 2010, the plaintiff's attorney in the child protection case filed a motion to dismiss Gulamali's petition and to return the children to him. The motion was mailed to the attorney for DHS on August 2, 2010.

62.     On August 6, 2010, Jackson County CPS put the plaintiff on the Central Registry. The written registry notice was signed by Fara Gulamali, the CPS investigator, and her supervisor, Nicki Kegerreis. The notice cited these grounds: "failure to protect, mental injury, threatened harm". There are no other details about the offenses for which he was put on the registry.  These could not be current offenses against his children because he had not lived with them since April 2006, and he had not seen them since October 2006, due to his incarceration and their foster care.

63.     The plaintiff has been unable to start the registry expungment process because he has insufficient information about accusations and evidence. He cannot take the first step towards expungment—requesting removal by the county DSH office — because he has been denied notice of the charges against him by a deficient registry notice and refusal to provide him discovery of his CPS file.

64.     From August 2010 through November 2011 the plaintiff's pro bono attorney wrote three letters to a Jackson County DHS supervisor and director requesting a copy of the CPS records.  The letters made clear that the discovery was needed to start the expungment

process.  The plaintiff and his attorney have received no response to those letters.  The plaintiff

still does not have his CPS  records.

65.     Unlike the other plaintiffs, the plaintiff does not have an economic loss from the

registry listing because he owns his business and is not a licensed caregiver.  The registry listing

has an adverse impact on his ability to raise his children. And he has the stigma of being labeled

a "child abuser", which is worse than being a felon.  The plaintiff wants to be removed from the

registry so he can pass background checks to participate in his children's lives, like being a

chaperone for school trips, or coaching their sports teams.

**[paragraphs 66-99 are reserved]**

**Central Registry Law and Procedures**

100.    The Michigan statutes on the Central Registry are in these scattered sections of

the Child Protection Law (CPL) in chapter 722 of the Michigan Compiled Code: §§ 722.622;

722.627; 722.627d (1); 722.627j; 722.628; 722.628d.

101.    A state can provide due process by provisions in state statutes or administrative

rules. There are no Michigan administrative rules related to the Central Registry.

102.    These are the statutes in the Child Protection Law that authorize employees of the

Department of Human Services to create and maintain an individual on the Central Registry for

life.  In these statutes "the department" is the Department of Human Services of which the

director is defendant MAURA CORRIGAN.

**MCL 722.622** provides:
Sec. 2.  As used in this act:.....

(b)  "Central Registry means the system maintained at the department that is used to keep a
record of all reports filed with the department under this act in which relevant and accurate
evidence of child abuse or neglect is found to exist.

(c)  "Central Registry case" means a child protective service case that the department classifies under sections 8 [MCL 722.628] and 8d [MCL 722.628d] as category I or category II. .....

(aa)  "Substantiated" means a child protective services case classified as a central registry case.

(bb)  "Unsubstantiated" means a child protective services case the department classifies under sections 8 and 8d as category III, IV, or category V.....

**MLC 722.627** provides:
Sec. 7

(1)     The department shall maintain a statewide, electronic central registry to carry out the intent of this act......

(4)  If the department classifies a report of suspected child abuse or neglect as a central registry case, the department shall maintain a record in the central registry[.]

(7)  If the investigation of a report conducted under this act fails to disclose evidence of abuse or neglect, the information identifying the subject of the report shall be expunged from the central registry.  If evidence of abuse or neglect exists, the department shall maintain the information in the central registry until the department receives reliable information that the perpetrator of the abuse or neglect is dead.

**MCL 722.628** provides:
Sec. 8......

(2)  In the course of its investigation, the department shall determine if the child is abused or neglected. ......

(11)  The department shall enter each report made under this act that the subject of a field investigation into the CPSI system. The department shall maintain a report entered on the CPSI system....if the case is classified as a central registry case, until the department receives reliable information that the perpetrator of the abuse or neglect is dead. .....

(12)  After completing a field investigation and based on its results, the department shall determine in which single category, prescribed by section 8d, to classify the allegation of child abuse or neglect......

**MCL 722.628d** provides:

Sec. 8d.

(1)  For the department's determination required by section 8, the categories, and the departmental response required for each category, are the following:....

(c)  Category III—community services required.  The department determines that there is a preponderance of evidence of child abuse or neglect, and the structured decision-making tool indicates a low or moderate risk of future harm to the child.  The department shall assist the child's family in receiving community-based services commensurate with the risk to the child. If the family does not voluntarily participate in services, or the family voluntarily participates in services, but does not progress toward alleviating the child's risk level, the department shall consider reclassifying the case as category II.

(d)  Category II—child protective services required. The department determines that there is evidence of child abuse or neglect, and the structured decision-making tool indicates a high or intensive risk of future harm to the child.  The department shall open a protective services case and provide the services necessary under this act. The department shall also list the perpetrator of the child abuse or neglect, based on the report that was the subject of the field investigation, on the central registry, either by name or as "unknown" if the perpetrator has not been identified.

(e)  Category I—court petition required. The department determines that there is evidence of child abuse or neglect and 1 or more of the following are true:

(i)  A court petition is required under another provision of this act.
(ii)  The child is not safe and a petition for removal is needed.
(iii)  The department previously classified the case as category II and the child's family does not voluntarily participate in services.
(iv)  There is a violation, involving the child, of a crime listed or described in section 8a(1)(b), (c), (d), or (f) or of child abuse in the first or second degree as prescribed in section 136b of the Michigan penal code, 1931 PA 328, MCL 750.136b.

(2)  In response to a category I classification, the department shall do all of the following:....

(c)  List the perpetrator of the child abuse or neglect, based on a report that was the subject of the field investigation, on the central registry, either by name or as "unknown" if the perpetrator has not been identified.

(3)  The department is not required to use the structured decision-making tool for a nonparent adult who resides outside the child's home who is the victim or alleged victim of child abuse or neglect or for an owner, operator, volunteer, or employee of a licensed or registered child care organization or a licensed or unlicensed adult foster care family home or adult foster care small

group home as those terms are defined in section 3 of the adult foster care facility licensing act, 1979 PA 218, MCL 400.703.

(4)  If following a field investigation the department determines that there is a preponderance of evidence that an individual listed in subsection (3) was the perpetrator of child abuse or neglect, the department shall list the perpetrator on the child abuse or neglect on the central registry.

103.    Under the statutes quoted in the preceding paragraph, all central registry listings require an agency investigative finding of child abuse or child neglect using the preponderance of the evidence standard.  In practice, this investigative finding is made by either a CPS investigator or the investigator's supervisor.  A CPS worker also renders an opinion or decisions on the other statutory requirements related to the registry listing. The CPS worker then inputs into a computer those opinions and decisions, the computer aggregates the data, the computer assigns a case classification, and if the case is classified as Category I or II, the computer automatically lists the individuals on the Central Registry.

104.    Michigan law does not provide for a judicial or administrative hearing before an individual is listed on the registry.  Michigan law does not require a court finding before an individual is listed on the registry. Under Michigan law, the individual can contest the registry listing only after it has occurred.  A subsequent civil or criminal court finding that the individual did not commit abuse or neglect is not a basis for removal from the registry in Michigan statutes, except a circuit court finding in a registry appeal.

105.    Most of the investigator findings that are relevant to the registry listing are inherently based on subjective opinions or discretionary decisions of CPS employees. A fair and adversarial hearing prior to the listing would allow additional evidence from both sides before a neutral decision-maker, which could prevent a mistaken listing, and so make the registry more reliable and fair.

106.    There is evidence from researchers, lawmakers, agencies, and the judiciary that CPS investigation findings of abuse and neglect are often inaccurate:

a.    Federal courts in Illinois  and New York concluded there was an error rate of about 75% for registry listings in those two states based on a review of the results of administrative expunction hearings. A Missouri state court found that a 35-40% reversal rate in administrative registry appeals.

b.    A 2004 the Connecticut child welfare agency admitted that half of its CPS findings of abuse or neglect get overturned on appeal.

c.    In the early 1990's the Michigan legislature noted a significant drop in CPS substantiations of child maltreatment after a law was passed requiring written notification to the individual of the registry listing.  In a legislative analysis of this data in 1992, the House of Representatives said that "many suspect that the figures suggest that notifying alleged perpetrators serves to prevent what would otherwise be erroneous entries onto the central registry."

d.    In another Michigan House of Representatives legislative analysis in 1994 is this statement: "Central registry information is widely acknowledged to be of uncertain accuracy."

e.    In 2009 the U.S. Department of Human Services recommended Congress not implement a law for a national child abuse registry. One reason was that data from state registries might be too unreliable because of

"procedural weaknesses"  in the state registry systems  that undermine the reliability of the registry information.  The report found that one of the key due process provisions for assuring reliability  is "the strength of the hearing or appeal procedures in place at the local level through which substantiation decisions may be challenged".  Congress has still not decided to enforce the national child abuse registry provision of the Adam Walsh Act it passed in 2006.

f.     A risk assessment score sheet (the "structured decision-making tool" referred to in the registry law) is required by Michigan law for most individuals to make a registry decision. A 2009 study of racial disparity in the Michigan child welfare system concluded that this risk assessment form is a flawed decision-making tool because it is "highly subjective" and CPS lacks "consistent oversight of or quality control on the use and application". The researchers found "forms were completed incorrectly and without supporting documentation and evidence".

g.     A 2004 report by a California task force said it is possible that half of that state's central registry entries should be purged.

h.     The Michigan Child Protection law requires CPS to list a person on the registry if CPS files a court petition to remove a child (a Category I case). CPS removal decisions have a high error rate.  A 2011 citizen review panel in Washington D.C. found that the CPS workers there were making poor removal decisions in the majority of cases; a true

emergency existed in less than a quarter of the removal cases in which the

children were quickly returned.  A 2001 statistical analysis by the U.S.

Department of Health and Human Services found that 1 in 3 removed

children suffered no maltreatment.

107.    The Michigan registry was originally created to assist civil and criminal

investigators. The plaintiffs agree with this statement from a report to Congress by the U.S.

Department of Health and Human Services on child abuse registries:  "State child abuse

registries play an important role in maltreatment investigations."   Michigan's child abuse

registry serves a legitimate function of enabling local CPS agencies within the state to share

information with each other about past maltreatment investigations to aid a current

investigation.

108.    The Michigan child abuse registry is not solely used for investigation purposes.

The Michigan child abuse registry is used for a non-investigative purpose—background checks.

109.    Some of the background checks are to screen child caretakers. To get federal

funding for its child welfare programs, Michigan uses the registry to screen foster parents and

prospective adoptive parents.  State law requires a registry clearance for all state licensed child

care providers, who also would suffer a financial loss if the registry listing is wrong.  Under

DHS policy, in a child protection case the agency will not place a child with a relative who is on

the registry, which interferes with the family connections of the child and the relative.

110.    Current foster parents are state-paid caregivers who can lose income and their

foster care license if they are on the registry. The importance of the reliability of the

investigative finding of abuse or neglect is greater for foster parents and other licensed

caregivers because the CPL and DHS policy requires them to be listed based only on the maltreatment finding.

111.    Starting in 2002 the CPL allows employers and volunteer organizations to obtain registry checks on applicants and current workers.  The statute governing this dissemination of registry information is MCL 722.622j.  From 2002-2008 the registry status information was available for child-related jobs or volunteer work.  In late 2008 the CPS was amended to expand access to central registry information for all types of employment or volunteer work.  In 2010 the Legislature cut back the registry access to positions that involve working with children, but the law allows DHS to release registry information to anyone who is "appropriate".  Despite the current limitation in the law, many Michigan employers and volunteer groups continue to require a registry clearance for work or activities that have nothing to do with children.

112.    According to a 2009 HHS report to Congress, most states allow registry information to be provided to employers for background checks.  HHS says that in many state these employments checks exceed the number of investigation uses of the registry. HHS cited a 2004 study in California that found employment-related registry checks were 80% of the registry check workload.

113.    On information and belief, the number of employment and volunteer requests for registry clearances also outnumber the investigative use. In Michigan a clean registry record is required for many paid and volunteer work even if it is not child-related. Employment and volunteer applications with a registry question are common for medical, education, social work, law enforcement, religious, retail, home health care, elder care, restaurants, and numerous other occupations and charity work that has nothing to do with children.

114.    DHS provides computer access for instant registry checks to a limited group, like schools. The rest of the registry information is requested and distributed in writing at the request of the individual, or with approval of the individual, anyone who wants to know.

115.    DHS has tried to ameliorate the harmful impacts of the background check feature of the registry law, but these measures have not removed the damage of a registry listing to the lives and livelihood of the listed individuals. For example, when an employer or other third party requests registry status, and the individual is on the registry, DHS does not answer the request.  But a reasonable person can figure out that "no response" means "yes, this person is on the Central Registry".  Or employers or other requestors will simply require the applicant to submit a written confirmation from DHS that the person is not on the registry.  If the form is not submitted, the applicant does not get the hired or can be fired. And the statute still allows registry information to be shared  by DHS with "whoever is appropriate".

116.    The 2009 HHS report to Congress noted the financial and due process consequences to a registry like Michigan's that uses the registry for background checks. These consequences apply in the private and public sector, including to foster parents who are paid to be child-caregivers by the state of Michigan:

> Whether or not employment related background checks remain a permissible use of the registry is an important factor in determining the due process protections that would be required....It must be recognized, however, that the denial of employment brings a potential impact to individuals included in the registry (or misidentified as such due to false positive matches) that would expose a system to legal challenge in ways that investigative uses alone would not....A number of experts consulted suggested that a registry should be limited to cases in which a minimum standard of due process protections, to be defined federally either in statute or regulation, had been afforded to the perpetrator. The extent of these protections would depend in large part on whether a registry

were to be used only for investigative purposes or also for non investigative purposes such as employment background checks.

117.    Michigan law attempts to provide an adequate due process alternative to a hearing before the listing.  Michigan provides expungment hearings—registry appeals—that are not available in some other states. The CPL provides an opportunity—after the listing— for written notice of the charges, discovery of the CPS file,  and an administrative hearing to challenge the listing conducted by a neutral and detached judicial officer.

118.     These are the key expungment procedures in the Child Protection Law and DHS policies:

(1)   DHS must provide a written notice to the accused perpetrator of the registry listing within 30 days by statute.  By DHS policy, the notice must be personally delivered or mailed within 5 working days of closing the CPS file.  The notice must include an explanation of the expunction rights, including the right to discovery of the CPS file. The notice form used by DHS does not identify the child or the offense or the date of the offense. The only description of the offense is a two or three word label (chosen from a list in the DHS computer), like "failure to protect",  "improper supervision", or "threatened harm".

(2)  Upon written request, DHS must provide a copy of most of the CPS file to the accused within 14 days.  After notifying the requestor, DHS can extend the time by an additional 14 days. DHS must provide written notice of a denial of the discovery request that includes reasons and appeal rights.  The notice of denial starts the 30 day appeal time for appeal to the circuit court.

(3)  At any time the accused can make a written request to the local DHS office—the office that did the listing— to amend or expunge an inaccurate or factually insufficient  registry listing or CPS file. The legal standard at the agency level is no relevant or accurate evidence.

(4)  If DHS refuses the request for amendment or expungment, or fails to act on the request within 30 days of receipt, the accused  has a right to an administrative hearing.  The accused must depend on the local DHS office—the one where the CPS investigator works—to get notice of  appeal rights. If DHS simply ignores the request, no notice of any kind will be sent. The accused only gets written notice of the right to a registry appeal if DHS denies the request in writing.

(5)  There is no law or policy allowing the accused to file the registry appeal with MAHS. The  registry appeal process can only start by the accused filing a written request for administrative hearing with the county DHS office that did the listing, which is addressed to the CPS investigator's supervisor.

(6)   The county DHS office processes the appeal paperwork.  It must immediately send the written hearing request to the scheduling office in MAHS. Within 15 days of receipt of the hearing request the county office must send a hearing summary form to MAHS.

(7)  The administrative hearing evidentiary standard is preponderance of the evidence based only on the evidence at the hearing.

(8)  The losing petitioner has a right to appeal the administrative order to the

circuit court within 60 days.  The circuit court standard of review is not de novo.


119.    The CPL says the administrative hearing is conducted by a hearing officer

appointed by DHS.  This has not been the practice for several years. The registry appeals are

conducted by administrative law judges working in a hearing agency outside DHS.

120.    Until 2011 the expungment hearings were conducted by the State Office of

Administrative Hearing Office (SOAHR) whose last director was defendant MIKE ZIMMER.

Since an executive order of defendant Governor RICK SNYDER in 2011,  the hearings are

conducted by the new Michigan Administrative Hearings System (MAHS), whose current

director is defendant MIKE ZIMMER.

121.    MAHS is located in the Department of Licensing and Regulatory Affairs

(LARA), whose current director is defendant STEVEN HILFINGER.  LARA handles the

administrative tasks for MAHS, such as budgeting and staffing.  On its legal work, including

handling the scheduling and acceptance of registry cases,  MAHS is independent of LARA.

122.    The registry expungment process, on its face and as applied,  is dysfunctional and

provides inadequate due process procedures for multiple reasons that apply to one or more of

the plaintiffs. These reasons include:

(1)  The registry notice is inadequate because it does not provide sufficient details of the

reasons for the listing.

(2)  There is no neutral gatekeeper in the initial stage of  the appeal process.  The

discovery rights, and initial appeal to DHS, are controlled by the county office that

did the CPS investigation and listed the person on the registry.  This is a prejudicial

setting in which discovery and appeal rights can be denied or delayed.

(3)  There is no enforcement procedure against DHS if the local office takes no action on

its duty to respond to requests for discovery, to conduct a local office review of the

listing, to send a notice of the county's decision, or to process and file the

administrative appeal.

(4)  The lack of a written response by DHS results in a lack of agency notice to the

accused of the administrative appeal rights.

 (5) The accused has no option to bypass the local office to file the registry appeal

directly in the hearing office. MAHS will not accept an appeal that has not been

processed through the local office.

(6) The administrative hearing is not prompt.  It can take several months to several years

to get a hearing.

123.    Either MAHS or LARA set the scheduling priority of registry appeals among the

other types of appeals MAHS handles. These priority decisions are made either by ZIMMER or

HILFINGER personally or through their staff.  Conducting prompt registry appeal hearings has

not been a priority in SOAHR or MAHS for at least the last five years.  For some other types of

DHS appeals, such as for government assistance programs, SOAHR and MAHS had goals for

expedited processing.  No such goals exist for registry appeals.  MAHS does them when they

have the staff or funding as did SOAHR before it.

124.    In registry appeals that the county office does properly and promptly process,  the primary reason for delays in getting administrative hearings scheduled  is the refusal or inability of MAHS to provide them promptly, mostly due to underfunding and understaffing of MAHS in the LARA budget, which in turn impacts management priority decisions.  Defendant HILFINGER controls the LARA and MAHS budget and is forced to work with inadequate funding from the Michigan Legislature for registry hearings.  Unlike some of the other hearings MAHS conducts, there are no federal funds for registry appeals and there is no state law direction to do them promptly.

125.    There is a federal requirement for prompt expungment of unsubstantiated or false CPS records affecting employment background checks.  The Central Registry is one such record. The provision is in the Child Abuse Prevention and Treatment Act (CAPTA) in 42 U.S.C. 5106a (b)(2)(A)(xii).  It states that the federal funding to Michigan for child abuse and neglect prevention programs is conditioned on a state plan that has

> provisions requiring, and procedures in place that facilitate the prompt expungement of any records that are accessible to the general public or are used for purposes of employment or other background checks in cases determined to be unsubstantiated or false [.]

126.    CAPTA requires that defendant Governor RICK SNYDER certify that Michigan has the required procedures to implement this federal directive.  In 2011 or 2012  Defendant SNYDER signed a certification that Michigan was complying with CAPTA, including the registry expungment provision. On that provision, the defendant's certification was not true. He did so to obtain $800,000 in federal funds for Michigan child welfare programs in fiscal year 2012. Governor SNYDER either signed the certification  without any evidence presented to him

that Michigan is providing prompt expungement procedures or signed it based on incorrect information from Director CORRIGAN's agency.

127.    MAHS controls how many registry cases can be opened or heard in a quarter or fiscal year. The decision to open or schedule registry appeals depends on MAHS priorities, funding for hearings, and the caseload demands in other cases.

128.    If the money allocated for hearings in a fiscal year runs out, MAHS stops having registry appeals, as did SOAHR before it.

129.    Annual reports from SOAHR from 2007 to 2010 report quarters where no registry appeal cases were opened or closed.  (The annual report for LARA for FY 2011 is on line, but there in no report for SOAHR or MAHS.)

130.    In 2009 for three consecutive quarters—9 months—SOAHR reported it opened no registry expungement cases and closed only four. This was the same year that defendant ZIMMER told a *Detroit News* reporter that recent management reassignments had decreased the backlog of registry appeals and SOAHR was currently scheduling hearings within 60 days of the request.

131.    The *Detroit News* article by Catherine Yun was dated June 4, 2009. The reporter said "family lawyers say that in many instances those accused have waited for years to get their requested hearing" at SOAHR.  She profiled a retired teacher who was denied a substitute teaching job for a registry listing she did not know about until 2004 based on a false accusation by her child in 1991 of physical abuse. She got an administrative hearing in April 2009 after waiting two years. Another anonymous couple had waited years to get an expungement hearing for false accusations of abuse by their teenagers, who admitted they self-inflicted scratches to

support their lies.  But the CPS investigative finding confirmed abuse, put them in the highest

risk category, and sent their children to foster care.

132.    In the same *Detroit News* article, the spokesperson for DHS emphasized that child

safety was his department's priority and blamed the legislature for any flaws in the registry

system.  The article contained this quote from the DHS spokesman: "When it comes to due

process, we leave that to the judicial system. If  there's concerns with the law, we leave that to

legislators."

133.    Michigan does not provide prompt registry expungment procedures, and allows

false or mistaken allegations of child abuse or neglect to be on a person's Central Registry

record for months, to years,  to life because: (1) Michigan provides no hearing to contest the

accusation before the person is listed on the registry;  (2) Michigan's expungment procedures,

on their face or as applied. They are unfair, unenforceable or unenforced, unknown to the

accused, and delay or deny justice and truth-finding; (3)  Director CORRIGAN'S agency does

create a reliable registry because most CPS investigation findings are wrong and sometimes the

agency impedes the post-appeal process that could correct those findings; and (4)  Directors

HILFINGER and ZIMMER's  agencies do not have the will or funding to provide prompt

administrative expungment hearings.

**LEGAL CLAIMS**

**COUNT I**
**14th Amendment:  Pre-Deprivation Procedural Due Process**
**Defendants:  Rick Snyder, Maura Corrigan**

A.      Acting under color of state law, the State of Michigan, through the defendants RICK SNYDER and MAURA CORRIGAN, acting in their official capacities, have deprived the plaintiffs of their constitutional right to fair procedures under the Due Process Clause of the Fourteenth Amendment by enforcing unconstitutional laws that caused them to be listed on the Central Registry of Child Abuse and Neglect based only on investigative findings and decisions of Children's Protective Services.

B.      Acting under color of state law,  the State of Michigan, through the defendants RICK SNYDER and MAURA CORRIGAN, acting in their official capacities, have deprived the plaintiffs of their constitutional right to fair procedures under the Due Process Clause of the Fourteenth Amendment by enforcing unconstitutional laws that caused them to be listed on the Central Registry of Child Abuse and Neglect without a prior hearing to contest the validity of the listing.

C.      As persons listed on the Michigan Central Registry of Child Abuse and Neglect by the Department of Human Services in 2010 or 2011,  the plaintiffs have been deprived of their constitutionally protected liberty or property rights in these ways:

(1)      A registry listing imposes the stigma of "child abuser" on the plaintiffs, which is a sufficiently severe stigma to violate the plaintiffs'  liberty interest in reputation because the accusation is put on a government list that is strictly confidential.

(2)     A registry listing deprives all the plaintiffs, as parents and grandparents, of their constitutionally protected liberty interest in child rearing, family associations, and freedom to pursue one's own vocation, now and for their entire life,  due to the life-term registry listing being used for background checks by employers;  volunteer organizations like schools, charities, sport teams, churches, and social service agencies; and child welfare agencies conducting background checks for foster parents and kinship care.

(3)     A registry listing has deprived plaintiffs TURNER, STEMPIEN, and MILLER of their property interests in employment and job training, and will continue to deprive them of job opportunities in the future,  due to their inability to pass background checks required by private and public employers, including the State of Michigan who provide payments to foster parents or other government subsidized or licensed caregivers.

D.     The Central Registry statutes of the State of Michigan in the Child Protection Law, on their face,  violate the procedural due process rights of all individuals listed on the Central Registry of Child Abuse and Neglect because:

(1)     the laws provide that an investigative finding of child abuse or neglect of a CPS investigator is the basis for all registry listings; and

(2)     the laws do not provide a procedure to contest the investigative finding before the listing at a neutral hearing.

Either or both of these inherent features in the statutory scheme create a substantial risk of mistaken listings, create a substantial risk of violation of the constitutional rights of everyone listed on the Central Registry, and do not provide a reliable database for making investigative or child protection decisions.

E.      For these constitutional violations, the plaintiffs request a removal of their names from the Central Registry; a declaratory judgment that Michigan Central Registry laws are unconstitutional; and a permanent injunction against Michigan adding additional names to the registry, maintaining the registry, or providing registry information to anyone, except for the purposes of civil or criminal investigations of child abuse or child neglect.

### COUNT II
### 14th Amendment Post-Deprivation Procedural Due Process
### Defendants: All

A.      Acting under color of state law, the State of Michigan, through all the defendants acting in their official capacities, have deprived the plaintiffs of their constitutional right to fair procedures under the Due Process Clause of the Fourteenth Amendment. The State of Michigan, having failed to provide them procedural due process before listing them on the Central Registry of Child Abuse and Neglect, has not provided them adequate and prompt due process procedures after the listing.

B.      The procedural due process violations include inadequate notice of the charges, discovery violations, deficient appeal processing by the county office (including discovery requests), substantially delayed administrative hearings, and other allegations stated in this complaint.

C.      The post-deprivation due process violations are systemic because they arise from a combination of state laws and management actions or omissions by the defendants that affect more persons than the plaintiffs. Acting under color of state law, the State of Michigan, through these defendants, who are acting in their official capacities, do not consistently require

local DHS offices to comply with their legal duties regarding registry appeals and do not require MAHS to have prompt administrative hearings on expungment requests or to be adequately staffed to do them.  Therefore, the laws, as applied, do not in most cases provide adequate due process protections to persons seeking to expunge their registry listing.

D.      For these constitutional violations, the plaintiffs request a removal of their names from the Central Registry; a declaratory judgment that Michigan Central Registry legal procedures for expungment are unconstitutional as applied due to lack of fairness, enforcement, and delays;  and a permanent injunction against Michigan listing or maintaining anyone on the Central Registry, except for the purposes of civil or criminal investigations of child abuse or child neglect, until the individuals who want to be expunged are given an adequate written notice of the accusations and a prompt administrative appeal hearing on the validity of their registry listing, if requested.

## PRAYER FOR RELIEF

The plaintiffs request this relief on this Complaint:

1.      A trial on any disputed material factual issues to granting relief.

2.      An order to defendant Maura Corrigan to remove the  plaintiffs
         from the Central Registry with an permanent injunction against
         defendants Maura Corrigan and Rick Snyder that they not be placed
         on the  registry again for the same offenses for which they were listed.

3.      A declaratory judgment that the Michigan Central Registry laws are
         unconstitutional on their face for a failure to provide due process
         procedures prior to the listing to determine the validity of the decision

to list the individual on the registry.

4.      A declaratory judgment that the Central Registry laws are unconstitutional as applied for a failure to provide and enforce fair and prompt due process procedures for removal from the registry.

5.      A permanent injunction against Michigan maintaining any person currently on the Central Registry unless Michigan can prove it provided the person with due process procedures before or after the listing, except that Michigan may maintain the current registry list for use in civil or criminal investigations of child abuse or child neglect or crimes against children and limited to investigator access.

6.      A permanent injunction against Michigan listing anyone on the Central Registry until it has implemented  and enforced constitutional laws and procedures. which have been approved by this court as adequate for the uses that Michigan chooses for its registry.

7.      A permanent injunction against Michigan allowing the Central Registry to be be used all background checks of any kind, until the state implements and enforces court approved constitutional laws and procedures to determine the validity of the listing decision before the results of the background check are reported to anyone.

8.      A permanent injunction against Rick Snyder from signing a certification for the federal government, for the purposes of receiving federal money, which

certifies that  Michigan is complying with the requirement in the Child Abuse

Prevention and Treatment Act  regarding prompt expungment procedures, until

this court has determined that the  certification is accurate.

9.      Any other fair and just relief to which they are entitled.


Dated: October 6, 2012                              s/ Elizabeth Warner
                                                    P.O. Box 1494
                                                    Jackson, MI 49204-1494
                                                    (517) 788-6004
                                                    eswarner@aol.com
                                                    P59379